STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF ANOKA                              TENTH JUDICIAL DISTRICT
                                              Case Type:  Other Contracts
_____

Medtronic, Inc., and Medtronic USA, Inc.,      Court File No.: 02-CV-16-413
Minnesota corporations,                        Judge:  Bethany A. Fountain Lindberg

                Plaintiffs,

                                                    AMENDED COMPLAINT

v.

Amanda Ernst, an individual, and Nevro Corp.,
a Delaware corporation.

                Defendants.
_____

For their Amended Complaint against Defendants Amanda Ernst ("Ernst") and Nevro

Corp. ("Nevro"), Plaintiffs Medtronic, Inc. and Medtronic USA, Inc. (collectively, "Medtronic")

state and allege as follows:

## INTRODUCTION

1.      Medtronic brings this action against its former employee, Ernst, for breaching her

covenant not to compete, and her new employer, Nevro, for inducing that breach. Ernst marketed

chronic pain therapy devices for Medtronic, and she promised not to work with competing

products for two years after leaving Medtronic.  In breach of her agreement, Ernst resigned from

Medtronic to take a position with Nevro marketing its directly competing chronic pain therapy

devices. Medtronic seeks declaratory and injunctive relief and damages for Ernst's contract

breach and Nevro's tortious interference.

## PARTIES

2.      Plaintiff Medtronic, Inc. is a Minnesota corporation with its principal place of

business in Fridley, Anoka County, Minnesota.

3.      Plaintiff Medtronic USA, Inc., a wholly-owned subsidiary of Medtronic, Inc., is a Minnesota corporation with its principal place of business in Fridley, Anoka County, Minnesota.

4.      Defendant Ernst is an individual who was employed by Medtronic in Anoka County, Minnesota from July 2009 until her resignation from Medtronic in November 2015. Ernst is currently employed by Defendant Nevro, which is a direct competitor of Medtronic in the business of developing , marketing, selling, and providing support for implantable medical devices approved by the United States Food and Drug Administration ("FDA") and regulatory bodies in other countries for the treatment of pain.  On information and belief, while employed by Medtronic Ernst's last known residence was in Circle Pines, Minnesota.

5.      Nevro is a publicly traded Delaware corporation with its principal place of business in California.

## JURISDICTION AND VENUE

6.      Medtronic and Ernst are parties to a Medtronic Employee Agreement ("Agreement") executed by Ernst on or about May 31, 2014, for good and valuable consideration.  A true and correct copy of the Agreement is attached hereto and incorporated by reference herein as Exhibit A.

7.      Section 7 of the Agreement provides that it is governed by Minnesota law, that Ernst consents to the personal jurisdiction of the state courts in the State of Minnesota, that any dispute arising out of or related to the Agreement "shall be exclusively decided by a state court in the State of Minnesota," and that Ernst irrevocably waives her right to have the laws of any other state applied to the interpretation of the Agreement or for the courts of any other state to decide disputes related hereto.  Ex. A, § 7.

2

8. Nevro is subject to personal jurisdiction in the State of Minnesota because, among other reasons, it transacts business within the State, and it was reasonably foreseeable that it would be bound by the Agreement's forum-selection clause when Nevro induced Ernst's breach.

9. Venue is proper in Anoka County because Ernst was employed by Medtronic in Anoka County, all or part of Medtronic's claims against Ernst arose in Anoka County, and Nevro tortiously interfered with the Agreement in Anoka County.

## BACKGROUND

### Medtronic's Neuromodulation Business

10. Medtronic, Inc. is a diversified medical technology company. Medtronic's Neuromodulation business—a part of Medtronic's Restorative Therapies Business Group—develops, manufactures, markets, sells, and provides support for implantable medical devices used to treat diseases and conditions involving the nervous system, including chronic pain.

11. Medtronic's largest-selling pain therapy device is a neurostimulator, also known as a "spinal cord stimulator" or "SCS" device. An SCS device is a surgically implanted device, about the size of a stopwatch, which masks pain by delivering mild electrical signals to the spine through one or more thin wires, called leads. Medtronic markets and sells SCS devices throughout the United States, Europe, Australia, New Zealand, and elsewhere.

### Nevro's Neuromodulation Business

12. Nevro is a medical device company that directly competes with Medtronic's Neuromodulation business in various geographies, including the United States, Europe, Australia, and New Zealand, in the development, marketing, sale, and support of SCS devices.

13. Nevro's sole product is an SCS device known as the Senza® system. Nevro's SCS device competes directly with Medtronic's SCS devices. Nevro's Form 10-K filed March

3

18, 2015 with the United States Securities and Exchange Commission states that its "major competitors are Medtronic, Boston Scientific and St. Jude Medical."

### Ernst's Medtronic Employee Agreement

14.     Medtronic originally hired Ernst as a summer intern in 2008, while she was an MBA student. In July 2009, after Ernst received an MBA in Marketing, Medtronic hired Ernst into a position in its Leadership Development Rotational Program. Ernst had no prior training or experience marketing medical devices before Medtronic hired her. Ernst was employed by Medtronic from July 2009 until she voluntarily resigned on November 2, 2015, effective immediately, to work for Nevro.

15.     From July 2009 until the spring of 2014, Ernst held several positions at Medtronic related to Medtronic's Cardiac Rhythm Disease Management and Neuromodulation businesses.

16.     In May 2014, Medtronic offered Ernst a promotion to the position of Marketing Program Manager within Medtronic's Neuromodulation business. Ernst accepted the promotion on or about May 31, 2014.

17.     As a condition of, and in consideration for, the May 2014 promotion—as well as for other good and valuable consideration—Ernst executed the then-current form of Medtronic Employee Agreement on or about May 31, 2014, a true and correct copy of which is attached as Exhibit A.

18.     Section 4.1 of the Agreement provides as follows:

> **Restrictions on Competition.** Employee agrees that while employed by MEDTRONIC, and *for two (2) years after the last day Employee is employed by MEDTRONIC, Employee will not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.* If, however, during the last twelve (12) months of employment with MEDTRONIC, Employee had no

4

management duties or responsibilities and was engaged exclusively in sales activities, including selling, soliciting the sale, or supporting the sale of MEDTRONIC PRODUCTS through direct contact with MEDTRONIC CUSTOMERS, this restriction will be for a duration of only one (1) year after the last day Employee is employed by MEDTRONIC, and will prohibit Employee only from soliciting, selling to, contacting, or attempting to divert business from, whether directly or by managing, directing or supervising others, any MEDTRONIC CUSTOMER on behalf of a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.

Ex. A § 4.1 (emphasis added).

19. During the twelve months preceding her resignation from Medtronic in November 2015, Ernst engaged in marketing activities, and was not engaged in sales activities. Accordingly, pursuant to the reasonable restrictions contained in Section 4.1 of the Agreement, Ernst has agreed that, for two years following the termination of her employment with Medtronic, "she will not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT." Ex. A § 4.1.

20. The Agreement contains the following definitions:

**MEDTRONIC PRODUCT(S)** means any goods, products, or product lines (a) that the services the Employee (or persons under Employee's management, direction or supervision) performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which the Employee was employed by MEDTRONIC, including without limitation services in the areas of research, design, development, production, manufacture, marketing, promotion, sales, or business, technical, regulatory or systems research, analysis, planning or support relating to such goods, products, or product lines, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

**CONFIDENTIAL INFORMATION** means any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, system, plan, or

5

process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to . . . vendor and customer data; employee and personnel data; . . . sales volumes; pricing strategies; sales and marketing plans and strategies; contracts and bids; and any business management techniques that are being planned or developed, utilized or executed by MEDTRONIC.

**CONFLICTING ORGANIZATION** means any person (including the Employee) or entity, and any parent, subsidiary, partner or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH AND SUPPORT.

**COMPETITIVE PRODUCT** means goods, products, product lines or services, and each and every component thereof, developed, designed, produced, manufactured, marketed, promoted, sold, supported, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

Ex. A §§ 1.1, 1.3, 1.4, 1.8.)

### *Ernst's Employment as a Marketing Program Manager for Medtronic*

21.     Ernst was employed by Medtronic in the position of Marketing Program Manager from on or about May 31, 2014, until her resignation from Medtronic on November 2, 2015.

22.     As a Marketing Program Manager, Ernst was responsible for marketing Medtronic's SCS devices, which compete directly with Nevro's Senza SCS device. Ernst's duties as a Marketing Program Manager included, but were not limited to, the following:

a.     Analyzing customer segment data and trends and developing strategies related thereto;

6

b.   Facilitating targeted customer engagement processes and plans;

c.   Developing and supporting ongoing customer development strategies;

d.   Developing targeted growth plans and recommendations for business partners;

e.   Partnering with internal Medtronic departments to develop and lead strategy and execution plans for key priority business initiatives;

f.   Leading physician advisory group teams to support ongoing strategy development and process improvements;

g.   Leading collaboration and monitoring of optimal customer engagement across all business functions;

h.   Focusing on national and global level thought and practice leaders; and

i.   Identifying key physicians to collaborate with Medtronic on product development projects and serving as a broker between those physicians and Medtronic's product development personnel.

23.   As a Marketing Program Manager, Ernst was not engaged in sales activity for Medtronic. She was not part of Medtronic's sales organization for neuromodulation devices. Her duties as a Marketing Program Manager did not possess the characteristics of the duties associated with Medtronic's neuromodulation sales personnel, such as a sales quota, payment on a commission basis, an assigned sales territory, and regular attendance at device implants.

24.   However, Ernst did maintain and develop, at Medtronic's expense, valuable relationships and goodwill with Medtronic customers within the neuromodulation market, including leading and influential physicians who specialize in the treatment of chronic pain through the use of SCS and other therapies and procedures (sometimes referred to in the industry as Key Opinion Leaders, or "KOL"s). The relationships and goodwill that Ernst developed with Medtronic's customers was developed on Medtronic's behalf and at Medtronic's expense.

25.   During her employment with Medtronic, Ernst was also provided with substantial amounts of Confidential Information relating to Medtronic's Neuromodulation business. This

7

Confidential Information included, but was not limited to, information regarding Medtronic's neuromodulation products, its customers in the neuromodulation market, and its strategies to compete in such market—such as its market development plans, current and upstream product development plans, strategies for improving its SCS system, and analyses of its competitors (including Nevro) and their neuromodulation products.

26.     Medtronic's Confidential Information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, its competitors in the neuromodulation market, who could obtain value from its disclosure or use. Medtronic uses reasonable efforts to protect its confidential information, including using confidentiality agreements and limiting access to such information by passwords and other means.

### *Ernst's Breach of Section 4.1 of the Agreement*

27.     On or about November 2, 2015, Ernst notified Medtronic that she was resigning to work for Nevro in Australia. Ernst is currently employed by Nevro as Market Development and Professional Education Manager.

28.     In her last year of Medtronic employment, Ernst was regularly provided and had access to Medtronic's Confidential Information relevant to the marketing and sale of SCS devices in Australia. This Confidential Information includes Medtronic's global market development plans, and marketing plans and strategies for competing specifically against Nevro's Senza device.

29.     Ernst could use her knowledge of Medtronic's marketing plans and strategies to help Nevro develop counter-strategies and plans in Australia. She could also use her knowledge

8

of Medtronic's market development plans to help Nevro grow its market share in Australia at Medtronic's expense.

30.     Medtronic's SCS devices are a MEDTRONIC PRODUCT under the Agreement, because Ernst marketed them in her last year of Medtronic employment, and she received CONFIDENTIAL INFORMATION about them.

31.     Nevro's Senza device is a COMPETITIVE PRODUCT under the Agreement, because it is the "same or similar, perform[s] . . . the same or similar functions, may be substituted for, or [is] intended or used for . . . the same purposes" as Medtronic's SCS devices.

32.     Nevro is a CONFLICTING ORGANIZATION under the Agreement, because Nevro is engaged in the promotion, marketing, sale, and support of a COMPETITIVE PRODUCT, its Senza device.

33.     Despite due demand, Ernst and Nevro have failed and refused to cease and desist violating the Agreement.

### *Ernst's Breach of Section 3.5 of the Agreement*

34.     Section 3.5 of the Agreement provides:

All documents and things provided to Employee by MEDTRONIC for use in connection with Employee's employment, or created by the Employee in the course and scope of Employee's employment by MEDTRONIC, are the property of MEDTRONIC and shall be held by Employee as a fiduciary on behalf of MEDTRONIC.  Upon termination of Employee's employment, Employee shall return promptly to MEDTRONIC, without the requirement of a prior demand by MEDTRONIC, all such documents and things, together with all copies, recordings, abstracts, notes,

9

reproductions or electronic versions of any kind made from or about the documents and things or the information they contain.

35. Upon termination of her employment, Ernst returned to Medtronic an iPad and a laptop computer. A forensic review of those devices showed that on October 20, 2015, thirteen days prior to her resignation to go to work for Nevro, Ernst copied a substantial number of Medtronic documents to an external USB storage device (often described as a "thumb drive" or "flash drive"). Ernst did not return a thumb drive containing those Medtronic documents to Medtronic upon termination of employment.

36. The documents Ernst copied to the external USB drive included global launch plans and strategies for Medtronic products that have already been launched into the marketplace, but the plans and strategies for which reveal Medtronic Confidential Information about how Medtronic plans and executes its product launches.

37. Several of the documents. Ernst copied to an external USB storage device contain Medtronic Neuromodulation's "best practice" guidelines for global launch and marketing activities. Among the documents Ms. Ernst downloaded are ones with titles such as "Global Product Launch Framework: Neuromodulation Best Practices for Product Launch;" "Neuro Launch Planning Best Practices;" "Global Launch Tracking Scorecard;" "Neuro Launch Process Reportcard;" "Communication and Action Plan—FDA Approval Notification;" and "Neuro-Regional County Launch Plan Outline." These documents provide great and deep insight into Medtronic's approach to marketing and product launches that would be invaluable to its competitors and, therefore, constitute Medtronic Confidential Information.

38.     In her most recent position at Medtronic, Ernst would  have had no reason to access and/or download those files on Oct 20th 2015, as they would have no immediate relevance to her role at that time.

39.     The contents of all of the documents Ernst copied to the external storage device would be useful to a competitor such as Nevro in understanding how Medtronic positions itself to market against its competitors, and the disclosure of such documents to Nevro would be very harmful to Medtronic.

40.     At this point in time Medtronic has no knowledge whether or not Ernst has shared any of the Medtronic information she copied with Nevro.  However, the circumstances and timing of her activities are highly suspicious.

41.     The documents copied to the external USB storage device constitute Medtronic Property.

42.     Ernst breached Section 3.5 of the Agreement by failing to return Medtronic Property to Medtronic upon termination of her employment.

## CAUSES OF ACTION

### COUNT ONE
#### *Breach of Contract Against Ernst (Section 4.1)*

43.     Medtronic realleges all and singular paragraphs 1 through 42 hereinabove.

44.     Ernst and Medtronic are parties to the Agreement.

45.     All conditions precedent under the Agreement have occurred.

46.     The Agreement is supported by consideration.

47.     Section  4.1 of the Agreement is reasonable and enforceable to protect Medtronic's legitimate business interests in confidential information and customer goodwill.

11

48.     Ernst has breached the Agreement, including without limitation Section 4.1, by becoming employed by a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT.

49.     Medtronic lacks an adequate remedy at law for Ernst's breaches of the Agreement, and Medtronic requires specific performance in the form of injunctive relief to prevent irreparable injury.

50.     By virtue of the foregoing, Medtronic is entitled to injunctive relief restraining Ernst from being employed by or performing services for Nevro in connection with or relating to neuromodulation pain therapy devices for two years following the termination of her Medtronic employment.

## COUNT TWO
### *Declaratory and Injunctive Relief Against Ernst*

51.     Medtronic realleges all and singular paragraphs 1 through 50 hereinabove.

52.     There is a ripe and justiciable controversy between Medtronic and Ernst.

53.     Medtronic is entitled to a declaration that the Agreement precludes Ernst from being employed by or performing services for Nevro in connection with or relating to neuromodulation pain therapy devices for two years following the termination of her Medtronic employment.

54.     Medtronic lacks an adequate remedy at law for Ernst's breaches of the Agreement, which threatens Medtronic with irreparable harm, including the misappropriation of its confidential information, loss of significant business, and injury to its customer goodwill.

55.     By virtue of the foregoing, Medtronic is entitled to injunctive relief restraining Ernst from being employed by or performing services for Nevro in connection with or relating to

12

neuromodulation pain therapy devices for two years following the termination of her Medtronic employment.

## COUNT THREE
### *Declaratory and Injunctive Relief Against Nevro*

56.     Medtronic realleges all and singular paragraphs 1 through 55 hereinabove.

57.     There is a ripe and justiciable controversy between Medtronic and Nevro.

58.     Medtronic is entitled to a declaration that the Agreement precludes Nevro from employing or receiving services from Ernst in connection with or relating to neuromodulation pain therapy devices for two years following the termination of her Medtronic employment.

59.     Medtronic lacks an adequate remedy at law for Ernst's breaches of the Agreement, which threatens Medtronic with irreparable harm, including the misappropriation of its confidential information, loss of significant business, and injury to its customer goodwill.

60.     By virtue of the foregoing, Medtronic is entitled to injunctive relief restraining Nevro from employing or receiving services from Ernst in connection with or relating to neuromodulation pain therapy devices for two years following the termination of her Medtronic employment.

## COUNT FOUR
### *Tortious Interference With Contract Against Nevro*

61.     Medtronic realleges all and singular paragraphs 1 through 60 hereinabove.

62.     At all relevant times, Nevro has had actual or constructive knowledge of the Agreement.

63.     Nevro has intentionally procured Ernst's breach of the Agreement by employing her in violation of it.

64.     Despite due demand, Nevro has failed and refused to cease and desist from employing Ernst in breach of her Agreement.

13

65.     Nevro lacks justification for its interference.

66.     Nevro's tortious interference with the Agreement has caused and will continue to cause Medtronic injury, including without limitation attorneys' fees and other expenses incurred as a result of being thrust into litigation with Ernst to protect its contractual rights.

67.     By reason of the foregoing, Medtronic is entitled to recover damages in an amount to be proven at trial.

## COUNT FIVE
### *Breach of Contract (Section 3.5)*

68.     Medtronic realleges all and singular paragraphs 1 through 67 hereinabove.

69.     Ernst and Medtronic are parties to the Agreement.

70.     All conditions precedent under the Agreement have occurred.

71.     The Agreement is supported by consideration.

72.     Ernst breached Section 3.5 of the Agreement by failing to return Medtronic Property to Medtronic upon termination of her employment.

73.     By reason of the foregoing, Medtronic is entitled to judgment in an amount in excess of $50,000 to compensate Medtronic for any damages it has suffered as a result of Ernst's failure to return the Medtronic Property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Medtronic, Inc., and Medtronic USA, Inc., pray for a judgment in their favor and against Defendants Amanda Ernst and Nevro Corp. as follows:

A.      Declaring that any employment of Ernst by Nevro or any performance of services by Ernst for Nevro prior to August 2, 2017, are breaches of the Agreement.

B.      Temporarily and permanently enjoining Ernst from being employed by or directly or indirectly performing services for Nevro until August 2, 2017.

14

C.      Temporarily and permanently enjoining and restraining Nevro and its heirs, successors, agents, assigns, and employees, and all persons in active concert or participation with them who receive actual notice of the Court's order, from employing Ernst in any capacity or receiving services from Ernst of any sort that violates the Agreement until August 2, 2017.

D.

E.      Awarding Medtronic damages against Defendants in an amount in excess of $50,000.

F.      Awarding Medtronic interest, costs, and disbursements herein.

G.      Awarding Medtronic such other, further, or different relief as the Court may deem just and equitable.

<strong>MASLON LLP</strong>

Dated:  February 3, 2016

By:     _s/ William Z. Pentelovitch_
   William Z. Pentelovitch (#85078)
   Wayne S. Moskowitz (#17936X)
   John T. Duffey (#0392157)
90 South Seventh Street – Suite 3300
Minneapolis, MN  55402-4140
Telephone:  (612) 672-8200
Email: bill.pentelovitch@maslon.com
   wayne.moskowitz@maslon.com
   john.duffey@maslon.com
**ATTORNEYS FOR PLAINTIFFS**

<strong>ACKNOWLEDGMENT</strong>

The undersigned hereby acknowledges that costs, disbursements and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.211, to the parties against whom the allegations in the Summons and Complaint are asserted.

_s/ William Z. Pentelovitch_
William Z. Pentelovitch

4820-5566-5197, v. 2