# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| MEDTRONIC, INC. and MEDTRONIC USA, INC., | Civil No. 16-244 (JRT/HB) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| AMANDA ERNST and NEVRO CORP., | |
| Defendants. | |

William Z. Pentelovitch, John Thomas Duffey, and Wayne S. Moskowitz, **MASLON LLP**, 90 South Seventh Street, Suite 3300, Minneapolis, MN 55402 for plaintiffs.

Robert J. Gilbertson, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402; and Kenneth A. Kuwayti and Nicholas Ethan Ham, **MORRISON & FOERSTER LLP**, 775 Page Mill Road, Palo Alto, CA 94304 for Nevro Corp.

Plaintiffs Medtronic, Inc. and Medtronic USA, Inc. (collectively "Medtronic") bring this action against their former employee, Amanda Ernst, and her new employer, Nevro Corp. ("Nevro"). Medtronic alleges that Ernst breached her employment agreement by accepting a position at Nevro, and that Nevro tortuously interfered with the agreement by hiring her. Medtronic brought this action in state court, where the state court judge granted its request for a temporary restraining order ("TRO"), enjoining Ernst from working at Nevro. Nevro then removed to federal court. Medtronic now moves for remand, and if remand is not granted, for a TRO and expedited discovery. Because the Court finds that Nevro is not a closely-related party bound by the forum-selection clause

in Ernst's agreement, it will deny Medtronic's motion for remand.  Also, because the Court finds that Medtronic has not shown sufficient likelihood of irreparable harm to justify the extreme remedy of a TRO, the Court will deny its motion for a TRO and expedited discovery.

## BACKGROUND

### I.    FACTUAL BACKGROUND

#### A.    The Parties

Medtronic is a medical technology company.  (Decl. of John T. Duffey ("Duffey Decl."), Ex. A ("Draper Decl.") ¶ 3, Feb. 8, 2016, Docket No. 15.)  Ernst worked on Medtronic's Neuromodulation business, which "develops and markets implantable medical devices used to treat diseases and conditions involving the nervous system," and includes "Medtronic's largest-selling pain therapy device[,] . . . a neurostimulator, also known as a 'spinal cord stimulator' or 'SCS' device."  (*Id.* ¶¶ 3-4.)

Nevro is one of Medtronic's global competitors in the neurostimulation-device market.  (*Id.* ¶ 7.)  Nevro's only product, Senza, is a high frequency SCS device, approved for sale in the United States in May 2015; it has been available in Europe since November 2010 and in Australia since 2011.  (Decl. of David Caraway ("Caraway Decl." ¶¶ 7, 9, Feb. 16, 2016, Docket No. 38; Decl. of Katherine Neuenfeldt ("Neuenfeldt Decl.") ¶ 6, Feb. 17, 2016, Docket No. 41.)  Senza operates at a higher frequency than other SCS devices and it does not produce "paresthesia" unlike other SCS devices with lower frequencies.  (Neuenfeldt Decl. ¶ 6.)  Nevro is the market leader in Australia, with

approximately one third of the market share, whereas Medtronic is considered fourth out of four companies in the Australian market.  (*Id.* ¶ 15.)

### B.  Ernst's Employment at Medtronic

Ernst first worked at Medtronic as a summer intern in 2008.  (Draper Decl. ¶ 9.) In July 2009, after Ernst earned her MBA, Medtronic hired her to their Leadership Development Rotational Program ("LDRP").  (*Id.* ¶ 9.)  Within the LDRP, Ernst worked in Medtronic's Cardiac Rhythm Disease Management business, and then in Medtronic's Neuromodulation business.  (*Id.* ¶¶ 10-11.)  Ernst did not work with SCS products in either of these rotations.  (Decl. of Amanda Ernst ("Ernst Decl.") ¶¶ 6-7, Feb. 16, 2016, Docket No. 37.)

In July 2012, Ernst left the LDRP and accepted a position as a Principal Market Development Specialist within the Neuromodulation business.  (Draper Decl. ¶ 11; *id.*, Exs. 6, 7.)  In this position she "worked as a pain market development manager, developing and executing a marketing strategy to grow Medtronic's TDD pain therapy business."  (*Id.* ¶ 11; *id.*, Ex. 4.)  But, she did not work with SCS products.  (Ernst Decl. ¶ 8.)

In May 2014, Ernst accepted a promotion to her final position at Medtronic. Medtronic describes Ernst's title as "Neuromodulation Marketing Program Manager," which is documented on her offer letter.  (Draper Decl. ¶ 12; *id.*, Ex. 8.)  According to Medtronic, Ernst's job description was as follows:

> Develop customer segment strategy and facilitate targeted customer engagement processes and plans for Pain Stim and TDD therapies.

> Champion program participation and execution in alignment with pan-
> neuro stakeholders in-house and with field teams.  Serve as lead relations
> manager for coordinating PAVE system utilization and optimizing value to
> organization.  Lead strategy and execution plans for key priority business
> initiatives.

(*Id.*, Ex. 11.)   Ernst contends that her new position was actually located within the "Customer Collaboration Group" and that her title was "Physician Collaboration Manager." (Ernst Decl. ¶ 9.)  According to Ernst, the other title was used only because the human resources department "did not have a separate category for the Customer Collaboration Group because it was a new department." (*Id.*)  Ernst's employment review and her LinkedIn page both reflect the title of "Physician Collaboration Manager."  (Draper Decl., Exs. 4, 12.)  Additionally, the job description provided by Medtronic is for a "Customer Relations Manager" or "Customer Relations Strategy Specialist," not for a "Marketing Program Manager." (*Id.*, Ex. 11.)

Medtronic contends that Ernst "worked on marketing, key physician collaboration, formal/contracted engagements, and advocacy development for Medtronic's SCS and TDD pain therapy devices." (*Id.* ¶ 12.)  Ernst describes her position as "focused on building and maintaining relationships with pain fellows by designing successful collaborations that would enhance the fellows' experience with Medtronic." (Ernst Decl. ¶ 10.)  In this role, Ernst gained exposure to SCS so that she could "speak intelligently about it," but she was "never as familiar with SCS as [she] was with TDD," and she "never took the training for SCS." (Ernst Decl. ¶ 12.)  She states that "the plan was to expand the Group to work with more advanced practice and thought leader physicians." (*Id.* ¶ 10.)

Ernst states that her position "was entirely customer-focused." (*Id.* ¶ 13.) She had two primary areas of responsibility. First, she "was responsible for supporting sales of Medtronic's pain management therapies . . . by strengthening relationships and providing customized customer service through coordinated collaborations with physicians in the United States." (*Id.* ¶14.) In this role she helped match physicians with Medtronic projects. (*Id.*) Second, she was "the main point of contact within Medtronic for a group of 30 or more U.S. physicians." (*Id.* ¶ 16.) She provided customer service and fielded questions from those physicians by "get[ting] answers from internal Medtronic teams or connect[ing] them directly to the experts." (*Id.*)

Ernst also contends that her work with Medtronic was exclusively focused on the U.S. market. (*Id.* ¶ 20.) She "never did any global work at Medtronic as a Physician Collaboration Manager and [has] never done any global work relating to SCS." (*Id.*) Additionally, Ernst states that Medtronic had a global marketing group, and that she was never a part of it. (*Id.*) In her 2015 employment review, Ernst filled out the field relating to global activities by stating, "[m]y role is primarily US focused and I have not approached it with a more global lens." (Draper Decl., Ex. 12 at 299.) Her supervisor wrote in response that he would "look for opportunities to extend experience and value globally." (*Id.*; Ernst Decl. ¶ 20). However, according to Ernst, he "never did find a global opportunity." (Ernst Decl. ¶ 20.)

Medtronic contends that Ernst "had access to Medtronic's confidential information relating to the marketing and sale of SCS devices, including Medtronic's global strategies for positioning itself to most advantageously compete against Nevro throughout the

world." (Draper Decl. ¶ 25.) These confidential materials included "Medtronic's confidential Pain Therapies FY16 Strategic plan," with "commercial marketing strategies and competitive positioning for currently approved SCS products." (*Id.* ¶ 26.) Ernst also "had access to Medtronic's confidential future SCS product development plans, including plans for SCS products that have not yet been market released." (*Id.* ¶ 30.) Ernst additionally developed "relationships and goodwill with Medtronic customers who are leading expert pain physicians." (*Id.* ¶ 32.)

### C.   Ernst's Employment Agreement

Ernst signed a new employment agreement with Medtronic as a condition for her promotion around May 31, 2014. (*Id.*, Ex. 10.) Under section 4.1 of the agreement, Ernst agreed not to work for a "CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT" for two years after her last day at Medtronic. (*Id.*, Ex. 10 § 4.1.) The agreement defines "COMPETITIVE PRODUCT" as products "that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT." (*Id.* § 1.1.) "MEDTRONIC PRODUCT" is defined to include "products, or product lines (a) that the services the Employee . . . performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which Employee was employed by MEDTRONIC . . . or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION." (*Id.* § 1.8.) Section

4.1 also contained an exception for employees without management duties who "engaged exclusively in sales activities" during the last year of employment. (*Id.* § 4.1.) If the sales exception applied, Ernst would be subject only to a one-year restriction from working with her prior customers for a competitor. (*Id.*)

Additionally, section 3.5 of the Employment Agreement provided that upon termination, Ernst must return all Medtronic property to Medtronic, including all documents provided or created during employment, and all copies and electronic versions of such documents. (*Id.* § 3.5.)

### D.     Ernst's Transition to Nevro

On November 2, 2015, Ernst resigned from her position with Medtronic in order to work for Nevro in Australia. (*Id.*, Ex. 9.) On January 4, 2016, Ernst began working at Nevro as a "Market Development and Professional Education Manager." (Ernst Decl. ¶ 2.) She received training in the United States, and then moved to Australia on January 18, 2016. (*Id.*) Ernst states that her work with Nevro is focused exclusively on Australia, although at some point it may extend to New Zealand. (*Id.* ¶ 33.) Ernst's work with Nevro will involve "direct to patient marketing activities," (Neuenfeldt Decl. ¶ 26), and "educating Australian physicians about Nevro's product by providing materials and by planning events and conferences in Australia," (Ernst Decl. ¶ 33). Ernst will not be working with the U.S. market or U.S. physicians. (*Id.* ¶ 33; Neuenfeldt Decl. ¶ 25.) She also will not be involved in Nevro's global marketing strategy. (Ernst Decl. ¶ 33; Neuenfeldt Decl. ¶ 26.)

An outside forensic data firm performed a forensic analysis of Ernst's computer at Medtronic.  (*See* Duffey Decl., Exs. B ("Routt Decl."), C ("Schulte Decl.").)  The review suggested that, on October 20, 2015 – thirteen days before Ernst's resignation – she downloaded some Medtronic information to an external USB storage device.  (Routt Decl. ¶ 5; Schulte Decl. ¶¶ 4-7.)  Ernst did not deliver a USB device to Medtronic upon her termination.  (Routt Decl. ¶ 7; Draper Decl. ¶¶ 4-7.)

Following the initiation of this litigation, Nevro arranged for a forensic vendor to pick up two thumb drives: one from Ernst in Australia and another from Ernst's family home in Iowa.  (Decl. of Wayne S. Moskowitz ("Moskowitz Decl."), Ex. D at 3, Feb. 8, 2016, Docket No. 20.)  The forensic vendor found that Ernst copied over three thousand files to one of the thumb drives on October 22 – eleven days before she resigned.  (*See id.*, Ex. F.)  The files were copied from three folders of her Medtronic laptop: "Personal," "Non Neuro Folders," and "Neuro."  (*Id.*)

Ernst contends that she attempted to copy the folders to her thumb drive so that she "would have a record of work product that [she] had produced over more than six years at Medtronic."  (Ernst Decl. ¶ 26.)  She contends that she attempted to copy the entire contents of five folders and did not select any particular documents on the basis that they would be helpful to her work at Nevro.  (*Id.*)  She asserts that she "had no intention of using the documents in these folders . . . at Nevro."  (*Id.*)  When she first tried copying the files, she "received several error messages" and so she tried again with the other thumb drive and fewer folders.  (*Id.* ¶ 27.)  Because of the error messages, Ernst contends that she did not think that there were Medtronic documents on the thumb drive

she brought with her to Australia.  (*Id.* ¶ 35.)  She stated that she has not used either of her thumb drives since leaving Medtronic and that she has never opened any of the documents on them.  (*Id.*)  The forensic analysis also confirms that none of the files had been accessed since October 2015.  (*See* Moskowitz Decl., Ex. F; Decl. of Kenneth Kuwayti ("Kuwayti Decl."), Ex. H, Feb. 16, 2016, Docket No. 39.)

According to additional analysis of the thumb drive, Ernst copied a number of whole folders in a "drag and drop" manner, as she stated; however, when copying documents to the "Neuro Best Practices Launch" folder, she copied the files individually over the course of an hour, in a "hunt and peck" approach.  (Suppl. Decl. of Christopher Schulte ("Suppl. Schulte Decl.") ¶ 11(f), Feb. 18, 2016, Docket No. 45.)  Among the documents copied in this manner were documents entitled "Neuro Global Launch Framework," "Neuro Launch Best Practices – Read me First," "Copy of Global Launch Tracking Scorecard," and others.  (*Id.* ¶ 11(g).)  The analysis suggests that these documents were not present on Ernst's laptop; rather, they were copied from Medtronic's intranet site on October 20, 2015.  (*Id.* ¶¶ 11-12.)

Both thumb drives have been transferred to independent third parties, (Decl. of John Tonsi ¶ 6, Feb. 16, 2016, Docket No. 40; Decl. of Seth Enoka ¶ 11, Feb. 17, 2016, Docket No. 42), and pursuant to a prior agreement between Nevro and Medtronic, the contents can be deleted or returned to Medtronic, as Medtronic wishes, (Moskowitz Decl., Ex. D at 5).

## II.     PROCEDURAL BACKGROUND

On January 27, 2016, Medtronic brought this action in state court seeking declaratory and injunctive relief and damages, alleging claims for breach of contract against Ernst and tortious interference against Nevro.  Medtronic also moved for a TRO. On February 1, 2016, the state court judge partially granted Medtronic's motion for a TRO without a hearing.  On February 2, 2016, Nevro removed the action to federal court. After a telephone status conference on February 5, 2016, this Court ordered that the state court TRO would remain in effect until further order.  On February 8, 2016, Medtronic filed a motion to remand and a motion for a TRO.  On February 16, 2016, Nevro responded and moved to dissolve the state court TRO.  On February 22, 2016, after oral argument on the pending motions, the Court granted Nevro's motion to dissolve the state court TRO.  The Court will now consider Medtronic's motion to remand and motion for a TRO.

## ANALYSIS

## I.     MOTION TO REMAND

### A.     Standard of Review

A defendant may remove a civil action to federal court only if the action could have been filed originally in federal court.  *See* 28 U.S.C. § 1441(b); *Gore v. Trans World Airlines*, 210 F.3d 944, 948 (8th Cir. 2000).  The party seeking removal bears the burden of demonstrating that the Court has jurisdiction.  *Bor-Son Bldg. Corp. v. Heller*, 572 F.2d 174, 181 n.13 (8th Cir. 1978).  The court resolves "all doubts about federal

jurisdiction . . . in favor of remand." *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 911 (8th Cir. 2009).

### B. Forum Selection Clause

Medtronic contends that removal was improper due to the forum selection clause in Ernst's employment agreement. Section 7.3 of the Employment Agreement provides as follows:

> **7.3 Venue and Personal Jurisdiction.** Any dispute arising out of or related to this Agreement, or any breach or alleged breach thereof, **shall be exclusively decided by a state court in the State of Minnesota**. Employee irrevocably waives Employee's right, if any, to have any disputes between Employee and MEDTRONIC arising out of or related to this Agreement decided in any jurisdiction or venue other than a state court in the State of Minnesota. Employee hereby irrevocably consents to the personal jurisdiction of the state courts in the State of Minnesota for the purposes of any action arising out of or related to this Agreement.

(Draper Decl., Ex. 10 § 7.3 (emphasis added).) Thus, under this agreement, Ernst agreed that Minnesota state court would be the exclusive venue for disputes arising out of the agreement, and therefore, she likely waived her right to remove to federal court and her ability to consent to removal. *See iNet Directories, LLC v. Developershed, Inc.*, 394 F.3d 1081, 1082 (8th Cir. 2005) (per curiam) (finding that defendant clearly and unequivocally waived right to removal by agreeing to forum selection clause). In many cases, the employee's inability to consent to removal would prevent his or her new employer from removing under the unanimity rule. *See Medtronic, Inc. v. Endologix, Inc.*, 530 F. Supp. 2d 1054, 1057 (D. Minn. 2008) (remanding in part because all parties must consent to removal and one party had waived the ability to consent to removal). Here,

however, Ernst was not served before removal, and thus she was not required to consent to the removal.[1]   Therefore, Medtronic must rely on its argument that Nevro itself is bound by the forum-selection clause as a closely related party.[2]

## C.   Closely Related Party

While Nevro was not a party to the employment agreement, Medtronic argues that it is bound by the forum-selection clause as a closely related party.  A non-contracting party may be bound by an agreement if it is "closely related to the dispute such that it becomes foreseeable that it will be bound."  *Marano Enters. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001) (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)).  This doctrine has largely "been used to enforce forum selection clauses against parties who are bound by a clearly common interest, such as a corporation

---

[1] There remains a dispute over Ernst's service in this case, but even Medtronic's date of service, February 4, 2016, was two days after removal on February 2, 2016.  (Moskowitz Decl., Ex. I; Pls.' Mem. of Law in Supp. of Mot. for Remand at 9, Feb. 8, 2016, Docket No. 14.)  To remove to federal court "all defendants who have been properly joined and served must join in or consent to the removal of the action."  28 U.S.C. § 1446(b)(2)(A).  Accordingly, consent is not required from defendants who were not served before removal.  *See Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1184 (10th Cir. 2014) (finding that the defendants' consent to removal was not required where plaintiff failed to show that defendants were served before removal); *Jones v. Kremer*, 28 F. Supp. 2d 1112, 1113 n.2 (D. Minn. 1998) (finding that not all defendants need to consent to removal where "a co-defendant has not been served at the time the removal petition is filed").  Similarly, the consent of a later-served defendant does not appear to be required.  *Roberts v. Palmer*, 354 F. Supp. 2d 1041, 1044 (E.D. Mo. 2005) (finding that defendants served after removal need not consent to removal).

[2] While the propriety of remand in this case turns on whether the employee was served before removal, the Court notes that its view may have been different if there were evidence that the former employee was somehow avoiding service in order to evade the forum selection clause.  But there is no such evidence here – Ernst was merely working in her new position in Australia.

and its subsidiary and spouses." *BTC-USA Corp. v. Novacare*, No. 07-3998, 2008 WL 2465814, at *5 (D. Minn. June 16, 2008) (finding that the employee of a contracting corporation was bound by the forum selection clause). In *Marano*, the Eighth Circuit found that a non-contracting plaintiff was bound by a forum selection clause as a closely-related party. 254 F.3d at 757-58. The court discussed the doctrine only briefly, but found that the plaintiff was closely related to the dispute – and therefore bound by the contract – because he was "a shareholder, officer, and director" of the contracting party and voluntarily joined the company in bringing suit under the agreements, "arguably acquiescing in the forum-selection clauses within those agreements." *Id.*

Several district court cases have considered the closely-related party doctrine since *Marano*. To determine whether a party is closely related to the dispute, courts have looked to its common interests with the contracting party in the litigation. *See Endologix*, 530 F. Supp. 2d at 1057. In *Endologix*, the court found the contracting employees and their new employer shared a common interest in the right of the employees to solicit their former customers for the new employer, and that this common interest was demonstrated by the fact that all three shared the same counsel. *Id.* Most courts have also relied on the fact that the non-contracting party voluntarily associated itself with the contracting party in some type of legal process. *See CH Robinson Worldwide, Inc. v. Rodriguez*, No. 12-264, 2012 WL 4856245, at *6 (D. Minn. Oct. 12, 2012) (relying on the fact that the new employer had "already sought a declaration of its rights under the Agreement" in federal court); *St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.*, No. 12-621, 2012 WL 1576141, at *5 (D. Minn. May 4, 2012) (relying on the fact that the new employer was a

"willing party to the first-filed" state action); *ELA Med., Inc. v. Arrhythmia Mgmt. Assocs., Inc.*, No. 06-3580, 2007 WL 892517, at *6 (D. Minn. Mar. 21, 2007) (relying on fact that new employer had previously "sought a judicial declaration" of rights under the agreement); *but see Endologix*, 530 F. Supp. 2d at 1057 (rejecting the defendants' argument that the closely-related party doctrine applies only when the non-contracting party voluntarily joined the litigation as a plaintiff).

Here, Medtronic argues that Nevro is a closely related party because it continued to employ Ernst while aware of her non-compete and forum selection clause, and it shares a common interest in Ernst's right to hold employment with Nevro in connection with SCS devices. As discussed above, both of these characteristics have been present in prior decisions finding a non-contracting party to be closely related; however, in the majority of those cases, including the Eighth Circuit case *Marano*, the courts also relied on the fact that the non-contracting party joined the contracting party in some type of litigation. Here, Nevro did not voluntarily join Ernst in any litigation.

The additional cases that Medtronic cites for the proposition that the non-contracting party need not voluntarily join in the litigation are distinguishable. In *BTC-USA Corp. v. Novacare*, the court applied the closely-related party doctrine to dismiss claims against a non-contracting individual defendant who worked for the defendant company when the plaintiff company signed the forum selection clause, and was being sued for his actions during that time. 2008 WL 2465814, at *5. Essentially, the court found that the contracting plaintiff could not evade the forum selection clause by suing an employee who did not sign the contract, rather than the contracting corporation. Thus,

while the employee in *BTC-USA Corp.* did not voluntarily join his employer in litigation, he shared a clear common interest – he was employed with the contracting company and was sued based on his actions during employment.  Additionally, the closely-related party doctrine was applied in his favor and against the contracting party; the employee was protected by the clause as closely related to his employer who was protected by the clause.  Thus, *BTC-USA Corp.* is distinguishable from the present context where Medtronic is attempting to bind a new employer to the agreement signed by Ernst while she worked for Medtronic.[3]

Overall, the Court is not persuaded that the closely-related party doctrine extends to Nevro here.  Nevro did not voluntarily join Ernst in any litigation.  Additionally, there is somewhat less evidence of a common interest because Nevro and Ernst are represented by separate counsel.  The Court thus declines to apply the closely-related party doctrine to bind an out-of-state new employer to state court based on a contract to which it was not a party and where it did not voluntarily join the contracting employee in any litigation.

---

[3] Medtronic also relies on *TLC Vision (USA) Corp. v. Freeman*, where the court found that it had personal jurisdiction over an out-of-state employer because it "had a reasonable expectation of being haled into the forum," but alternatively found jurisdiction due to a forum selection clause because the employer continued to negotiate with the employee even though it knew about the employment agreement and there was a common interest demonstrated by shared counsel.  No. 12-1855, 2013 WL 230254, at *11 (E.D. Mo. Jan. 22, 2013).  Thus, the court considered the closely-related party doctrine only in the alternative and also only in the context of personal jurisdiction.

## II.      MOTION FOR A TRO

### A.      Standard of Review

Medtronic has also moved the Court for a TRO enjoining Ernst from working at Nevro.  The Court considers four factors in determining whether to issue a preliminary injunction or temporary restraining order: (1) the threat of irreparable harm to the moving party, (2) the probability that the moving party will succeed on the merits, (3) the balance of harms as between the parties, and (4) the public interest.  *See Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also Callerons v. FSI Int'l, Inc.*, Civ. No. 12-2120, 2012 WL 4097832, at *2 n.5 (D. Minn. Sept. 18, 2012) (explaining that these factors apply to both preliminary injunctions and temporary restraining orders). However, "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."  *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  The burden of establishing the propriety of a TRO is on the movant.  *See Watkins, Inc.*, 346 F.3d at 844.

### B.      Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "Where a

former employee violates a valid covenant not to compete, the Court may infer irreparable harm to the employer." *Medtronic, Inc. v. Camp*, No. 02-285, 2002 WL 207116, at *2 (D. Minn. Feb. 6, 2002).  However, "such an inference is not axiomatic." *Midwest Urologic Stone Unit Ltd. P'ship v. Domina*, No. 01-212, 2001 WL 228447, at *2 (D. Minn. Feb. 22, 2001).  "A former employee's breach of a restrictive covenant does not necessarily entail irreparable harm." *Timm & Assocs., Inc. v. Broad*, No. 05-2370, 2005 WL 3241832, *3 (D. Minn. Nov. 30, 2005).  The moving party must still "show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

Here, Medtronic does not sufficiently describe any specific, certain, and imminent harms requiring equitable relief.  Medtronic relies in part on the confidential information on Ernst's thumb drives, and the potential misuse of that information; however, forensic analysis suggests that no one has accessed those files since Ernst left Medtronic, and Ernst and Nevro no longer have access to the files.  Ernst's work with Medtronic was focused on the U.S. market, and there is no indication that she has any confidential information about Medtronic's global or Australian marketing plan.  Additionally, Ernst will not be working on Nevro's global marketing; instead, her position involves direct contact with physicians in Australia.

Medtronic also argues that it risks conversion of its customer goodwill.  Ernst likely established goodwill with the physicians she worked with during her time with Medtronic; however, it appears that she worked only with physicians in the United States,

CASE 0:16-cv-00244-JRT-HB   Document 81   Filed 04/26/16   Page 18 of 19

and in her position with Nevro, Ernst will deal only with Australian physicians. Medtronic argues that "Ernst could use the goodwill she developed with Medtronic's physician customers in the United States to introduce them to Australian physicians whose experience with Nevro's SCS device . . . might persuade the American physicians" to try Nevro's device.  (Pl.'s Mem. of Law in Supp. of Mot. for TRO at 23, Feb. 8, 2016, Docket No. 19.)  However, this is pure speculation.  There is no indication that Ernst has reached out to any of her U.S. contacts, and she has been instructed by Nevro not to do so.  (*See* Neuenfeldt Decl. ¶ 27.)

Overall, the documents submitted to the Court suggest that Ernst worked directly with U.S. physicians, and was not involved in high-level or global marketing policy. Medtronic has not shown how Ernst working for Nevro directly with physicians on the other side of the globe would cause Medtronic irreparable harm.  The result may have been different if Ernst remained in possession of pertinent confidential Medtronic documents, but the evidence submitted shows that she never accessed the documents after leaving Medtronic and all documents have been returned to Medtronic. Additionally, the documents specifically chosen by Ernst related primarily to product launches and do not appear relevant to Ernst's role at Nevro.  In sum, Medtronic has not shown certain, great, and imminent harm demonstrating a clear and present need for equitable relief.

Thus, because Medtronic has failed to carry its burden by demonstrating a threat of irreparable harm, the Court will deny its motion for a TRO.

### III.    EXPEDITED RECOVERY

Medtronic also requested expedited discovery including written discovery and depositions from Ernst and Nevro and their witnesses.  (Pl.'s Mem. in Supp. of Mot. for TRO at 28-29.)  Nevro opposes the request, arguing that Medtronic has not shown any circumstances requiring exigency.  Because the Court does not find a likelihood of irreparable harm, Medtronic has not shown that expedited discovery is necessary, and the Court will deny its request.  Both parties appear interested in proceeding quickly in this case, and the Court finds no need to depart from standard practice by setting expedited deadlines.  Thus, the Court will refer the parties to the Magistrate Judge to determine a prompt discovery schedule.


### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Medtronic's Motion to Remand [Docket No. 12] is **DENIED**.

2.    Medtronic's Motion for a TRO [Docket No. 17] is **DENIED**.


DATED:   April 26, 2016
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
Chief Judge
United States District Court